RECEIVED IN ALEXANDRIA, LA.
MAR 3 1 2010
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| **HARDY ANDERSON** | CIVIL ACTION NO. 1:05-cv-00932 |
| -vs- | JUDGE DRELL |
| **TIM WILKINSON** | MAGISTRATE JUDGE KIRK |

## REASONS FOR JUDGMENT

Before the Court for decision after trial on the merits is a civil rights complaint brought pursuant to 42 U.S.C. § 1983. The suit was filed, handled, and tried by Hardy Anderson, acting *pro se*. Tim Wilkinson, warden of Winn Correctional Center ("WCC"), is the only defendant. The claims made by Anderson relate to alleged understaffing and a concomitant failure to protect him.

An earlier motion for summary judgment by Wilkinson was denied by the Court because there were a number of genuine issues of material fact as to what exactly was the staffing situation at WCC: what knowledge, warning, or reason to know of prior incidents that Wilkinson had; and what inadequacies of security did or did not exist at the time of the incident. (Document No. 34.)

A one-day bench trial was held on September 1, 2009. Because defendant had not produced all of plaintiff's medical records before or at trial, the record was left open for submission of those records, and they subsequently were filed. The matter is therefore ripe for decision. Based upon the trial testimony, on the unusual facts of this case and

the credibility of witnesses, we find that Tim Wilkinson is liable to plaintiff, as explained below.[1]

We begin with a repeat recitation of the law applicable in this case as set forth previously in the magistrate judge's report and recommendation.

The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1977 (1994). In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Being violently assaulted in prison is simply not a part of the penalty that criminal offenders pay for their offenses against society. Farmer, 114 S.Ct. at 1976-77.

For an inmate to succeed on a claim based on a failure to prevent harm, he must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) the prison official was "deliberately indifferent" to his health or safety. Failing to act with deliberate indifference to a substantial risk of harm is the equivalent of recklessly disregarding that risk. Farmer, 114 S.Ct. at 1978. Deliberate indifference is a subjective test and it must be shown that the official actually knew of the risk of harm to the inmate. It is insufficient to show solely that the official should have known

---

[1] The complaint does not specifically allege whether Wilkinson is being sued in his personal or official capacity. (Document No. 1.) Under these circumstances, the jurisprudence provides the Court should look to the course of the proceedings to determine the issue. Kentucky v. Graham, 473 U.S. 159, 166-67, 105 S.Ct. 3099 (1985). In his answer, Wilkinson asserts a qualified immunity defense (Document No. 11), which is only available in a personal-capacity suit. Id. Thus, this is only a personal-capacity claim.

of the risk. The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. Farmer, 114 S.Ct. at 1979.

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. It remains open to an official to prove that he was unaware even of an obvious risk to inmate health and safety. Farmer, 114 S.Ct. at 1981-82. Also, Hinojosa v. Johnson, 277 Fed.Appx. 370, 374 (5th Cir. 2008). However, a prison official who actually knew of a substantial risk to inmate health and safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted. Farmer, 114 S.Ct. at 1982-83.

The failure of a prisoner to give any advance notice to prison officials of potential danger to the prisoner's safety is not dispositive of the issue of the official's awareness, nor is advance notice of a substantial risk of assault posed by a particular fellow prisoner a prerequisite. Farmer, 114 S.Ct. at 1984-1985.

Anderson alleges Wilkinson's liability for his safety stems from the fact that Wilkinson failed to provide enough officers to monitor the dorms and failed to implement policies for properly monitoring and patrolling the dorms. Well settled §1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates' actions. Supervisory officials may be held liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement

unconstitutional policies that causally result in plaintiff's injury. Mouille v. City of Live Oak, Tex., 977 F.2d 924, 929 (5th Cir. 1992), cert. den., 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).

Knowledge of prison under-staffing and a decision not to increase the number of guards on duty may amount to deliberate indifference to the safety and well-being of the inmates, in violation of the Eighth Amendment. See Edwards v. Gilbert, 867 F.2d 1271 (11th Cir. 1989); Anderson v. City of Atlanta, 778 F.2d 678, 685 (11th Cir. 1985). Under-staffing of correctional officers increases the risk of inmate on inmate violence. To prevail, a plaintiff must plead and prove there was a policy at the WCC, promulgated or implemented by Warden Wilkinson, of deliberate indifference to the risk of under-staffing and that this policy caused his injury. Greason v. Kemp, 891 F.2d 829, 838 (11th Cir. 1990); Westmoreland v. Brown, 883 F.Supp. 67, 76 (W.D.Va. 1995). Evidence of understaffing, without more, is not proof of official policy. Hood v. Itawamba, 819 F.Supp. 556, 566 (N.D. Miss. 1993); Gagne v. City of Galveston, 671 F.Supp. 1130, 1135 (S.D.Tex. 1987), aff'd, 851 F.2d 359 (5th Cir. 1988). Evidence of understaffing would become proof of an official policy only if more complete funding and staffing were possible and it was the deliberate intent of the policy-making official not to adequately fund and staff the jail. Gagne, 671 F.Supp. at 1135. When understaffing appears to have contributed to a violation of an inmate's Eighth Amendment rights, a causal link exists between that violation and the policy if officials are aware of the staffing problem but fail to take corrective action. Greason, 891 F.2d at 837 n.18, and cases cited therein.

The facts, as we understand them, adduced at trial, are these: On May 3, 2004, Anderson, according to medical records, a fifty-five year old inmate, was in his usual mode at WCC. Earlier in the day or evening, an inmate new to Anderson's dormitory, began making "bad accusations" toward Anderson and a "fight" resulted between the two men. The record is unclear as to whether there were any fisticuffs involved, but we appreciate the import to be that the "fight" was mostly verbal, as noted in the incident report prepared by the prison. It is undisputed that this altercation, whatever it was, was not contemporaneously reported to anyone in authority at the prison. There is likewise no evidence that anyone at the prison, much less Wilkinson, had any actual knowledge of bad blood between these two men. According to Anderson's testimony, he did not even know the other inmate before all of this started earlier that day.

Whatever occurred apparently left the other inmate to think it was an unfinished matter, for, about 1:45 or 2:00 A.M., the inmate heated water in a microwave oven furnished at the prison and located inside the tier near the inmates' sleeping area. He then threw the water on Anderson, significantly scalding him with resulting first and second degree burns. Thus harshly awakened, Anderson physically defended himself until this second altercation was broken up by prison staff.

Significantly, the staffing arrangement at WCC does not provide for any staff member to be inside of the tier during the night. Staff remains outside, in a more central area, but does make periodic security checks and walkthroughs for count purposes. It is undisputed that no staff member was inside at the immediate time of incident. There *is*, however, evidence that Barbara Toms, a staff member, had conversed with the other

inmate only a few minutes before and was aware that the inmate was using the microwave oven to heat water at this most unusual time of night. According to the testimony of Warden Wilkinson, microwave ovens were not previously always provided in these inmate tiers. Originally, they were a privilege for the "honor dorm," according to witness, Barbara Toms. Then they were expanded and put into the other dorms. According to Wilkinson, the microwave ovens are both a privilege and a "tool," because if someone uses one improperly, as he said, "then we have the ability to take that away as a tool and say you messed up, don't do it no more [sic]." Similarly, Wilkinson testified that there are no rules for use of the microwave, no time restrictions on inmate use of them, and, additionally, inmates are allowed to have a number of foodstuffs in the dormitory area, such as coffee and hot chocolate.

In another vein, Wilkinson explained on cross examination from Anderson that, based on his twenty-eight year experience with prisons, fights and arguments, and even stabbings, between inmates are inevitable. Indeed, he said that he has yet to be in an institution, male, female or juvenile, where water-throwing incidents, fights, stabbings and other aggressive behavior did not occur. Warden Wilkinson stated those things with authority.

We first observe that plaintiff's claims regarding the general question of security adequacy must fall. The defense in this case presented more than sufficient evidence to show that the prison had, on this occasion, adequate numbers of security staff. The only questionable remaining issue in that regard is whether the prison should have had a security person *inside* of the tier. The evidence before the Court is that inside security

during sleeping hours is done in some places. In others, including a couple of similarly designed prisons in Louisiana, the actual security persons remain in a central area outside the tier, but they make periodic inspections internal to the tier. At WCC, this is what happens, and we cannot say that the documented inspection routine at WCC is inadequate, absent other circumstances.

It is, however, those other circumstances which must have our attention at this juncture. What we know from the above may be summarized by observing from the evidence that: (1) prisoners will inevitably have disagreements, often violent ones; (2) water-throwing incidents are well documented in this warden's experience; (3) as a matter of internal policy at WCC, under Wilkinson's direction, the placement of microwave ovens is both an incentive and a tool of discipline. What we observe as well is that there are *no* guidelines at the prison for regulating access to the microwave ovens at sleeping times when another inmate's defenses are obviously down. We conclude that it is not necessary to remove access entirely. Many precautions could be taken. The microwave could be unplugged at night, rolled out to the lobby on a cart, have access restricted at times when lights out occurs, or be used only under the watchful eyes of security personnel.

It must, therefore, be obvious that the furnishing of a microwave oven under the circumstances presented in this case, in light of a known likely risk of injury to others, and in the absence of inside tier security, is akin simply to placing a knife on the table and hoping that inmates will behave and not use the knife for nefarious purposes. Put simply, the warden is responsible for putting a dangerous instrumentality in the hands

of inmates, deliberately and knowing its obvious risks. The problem is especially poignant here, where, again, Barbara Toms also told the Court she had spoken with the offending inmate even as he was planning his assault on Anderson. The obvious conclusion is that, had a security person been present, the inmate probably would have refrained, as he was described as courteous in speaking with Toms.

Couched in terms of the law of deliberate indifference, the warden admitted to the Court that he knew of the likelihood of this kind of water-throwing risk to inmates, and we find that the placement of such a dangerous instrumentality within inmates' reach, without regulation, monitoring, or having the oven secure, clearly constitutes deliberate indifference on the facts of this case. Accordingly, we find Warden Wilkinson responsible and liable to Anderson. What remains is to quantify Anderson's losses.

The medical records show that on May 3, 2004, Anderson was seen in the WCC infirmary with complaints of scald burns to his face, the right side of his neck, and his right shoulder. In light of the second degree nature of some of the burns and their proximity to his nose and eyes, the attending nurse retained him in the prison ward for observation. In addition to his burns, which generally healed well, except for some permanent skin discoloration noted at trial, Anderson continued to complain of problems with his right eye. Although Patricia Thomas, the medical staff member called by the defense as a witness at trial, attempted to minimize and/or deny any eye injury, plaintiff repeatedly called our attention to this issue regarding his medical records. He also asserted a significant number of visits to an outside eye clinic. Upon receipt of those records after trial, we note that some injury to Anderson's eye is obvious and apparent.

As mentioned above, this incident occurred on May 3, 2004. The medical records reflect continuing right eye redness, discomfort, and swelling as late as September 15, 2004. (Medical records, p. 250.) Anderson's main complaints concerning his right eye were of blurry vision. The documents also verify trips to the Louisiana State University burn clinic in Shreveport for several weeks. Although burns are, obviously, painful, the medical notes reflect that, for the most part, after the initial trauma, Anderson was relatively cheerful, and his complaints of discomfort to medical personnel were mild.

In Garcie v. Britt, 653 So.2d 131 (La. App. 3d Cir. 1995), plaintiff sustained first and second degree burns to the face and incurred minimal medical expenses. The court awarded compensatory damages of $5,500.

A more serious verdict of $15,000 was given for second degree burns to the hand, abdomen, and groin area, with two days of hospitalization and noticeable skin discoloration. Flint v. Trolley Stop, 843 So.2d 635 (La. App. 4th Cir. 2003).

The burns described in this case are more serious than those in Garcie, because of the eye involvement, but they are not as serious as those sustained by Plaintiff in Flint. Therefore, we find compensatory damages of $9,000.00 to be sufficient.

For the reasons set forth herein, this Court will render judgment in favor of Hardy Anderson and against Tim Wilkinson in the amount of $9,000.00 plus legal interest and costs, if any, as provided by law.

SIGNED on this 31st day of March, 2010 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE